UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 4, 2013

M.F., individually and on behalf of C.F.,

                    Plaintiff,

          -against-

NEW YORK CITY BOARD OF
EDUCATION, d.b.a. NEW YORK CITY
DEPARTMENT OF EDUCATION, and
DENNIS M. WALCOTT, in his official
capacity as Chancellor of the New York City
School Districts,

                    Defendants

**MEMORANDUM
OPINION & ORDER**

11 Civ. 6526 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff M.F. brings this action – on behalf of herself and her son, C.F. – under

the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.  Defendants

are the New York City Department of Education ("DOE") and its chancellor.

          Plaintiff seeks to overturn a State Review Officer's decision reversing an

Impartial Hearing Officer's finding that Plaintiff is entitled to tuition reimbursement and a

retroactive direct tuition payment for the 2010-11 school year.[1]

          Pending before the Court is Plaintiff's motion for summary judgment.  For the

reasons stated below, Plaintiff's motion will be GRANTED.

---

[1]  The Complaint includes a second cause of action seeking a declaration that Plaintiff is entitled
to private school tuition reimbursement for the 2011-12 school year.  (Cmplt. ¶¶ 97-113)  The
parties entered into a stipulation of discontinuance concerning this cause of action on July 11,
2012.

## I.     **STATUTORY BACKGROUND**

Under IDEA, "states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'"  Gagliardo v. Arlington Centr. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998).  A "free appropriate public education" ("FAPE") must include "'special education and related services' tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  Walczak, 142 F.3d at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (internal citations omitted)).

Special education and related services under IDEA are provided by a school district pursuant to an annual individualized education program ("IEP").  Walczak, 142 F.3d at 122; see also 20 U.S.C. § 1414(d).  In New York, local committees on special education ("CSE") are responsible for developing appropriate IEPs.  Id. at 123.  "In developing a particular child's IEP, a CSE is required to consider four factors:  (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs."  Gagliardo, 489 F.3d at 107-08 (2d Cir. 2007) (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(ww)(3)(i)).

Parents who wish to challenge the adequacy of an IEP developed by their local CSE may request an impartial due process hearing before an impartial hearing officer ("IHO") appointed by the local school board.  Id. (citing 20 U.S.C. § 1415(f) and N.Y. Educ. Law § 4404(1)).  An aggrieved party may appeal an IHO's decision to a state review officer ("SRO"), and the SRO's decision may be challenged in either federal or state court.  Id.  (citing 20 U.S.C. §§ 1415(g), (i)(2)(A) and N.Y. Educ. Law § 4404(2)).

Parents pursuing an administrative challenge "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state."  Gagliardo, 489 F.3d at 111 (citing Sch. Comm. of Town of Burlington, Mass v. Dep't of Educ. of Mass, 471 U.S. 359, 370 (1985)).  Such reimbursement covers "'expenses that [the school district] should have paid all along.'"  T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (quoting Burlington, 471 U.S. at 370-71).

A request for private school tuition reimbursement, or for a retroactive direct tuition payment, requires a court to consider whether (1) "the school district [has] fail[ed] to provide a FAPE"; (2) "the private-school placement is appropriate"; and (3) the "equities" warrant a tuition reimbursement or direct payment award in full or in part.  Forest Grove School Dist. v. T.A., 557 U.S. 230, 247 (2009); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363-64 (2d Cir. 2006); Mr. & Mrs. A. ex rel. D.A. v. N.Y.C. Dept. of Educ., 769 F. Supp. 2d 403, 415 (S.D.N.Y. 2011); S.W. v. N.Y.C. Dept. of Educ., 646 F. Supp. 2d 346, 360 n.3 (S.D.N.Y. 2009).  Because this analytical framework is the product of two Supreme Court decisions – School Committee of Town of Burlington, 471 U.S. at 370 and Florence County School District Four v. Carter, 510 U.S. 7, 15-16 (1993) – it is often referred to as the "Burlington/Carter test."   Parents bear the burden of persuasion as to each element of a claim for private school tuition reimbursement.  Schaffer v. Weast, 546 U.S. 49, 57-58 (2005).

Here, DOE conceded at the impartial hearing that the placement it offered to C.F. was not appropriate.  (Transcript of Impartial Hearing ("Tr.") at 30-31; Pltf. R. 56.1 Stmt. ¶ 47[2])

---

[2]  Unless otherwise noted, citations to the parties' Local Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were neither admitted nor denied by the opposing party or have not been contradicted by citations to admissible evidence.

Given DOE's concession that it did not offer C.F. a FAPE for the 2010-11 school year, the first prong of the Burlington/Carter test is satisfied. Accordingly, this Court must go on to consider whether the private school unilaterally chosen by M.F. – the Aaron School – was an appropriate placement and, if so, whether the equities favor tuition reimbursement and a retroactive direct tuition payment. See Forest Grove, 557 U.S. at 247.

## II.   ADMINISTRATIVE PROCEEDINGS

By letters dated September 24, 2010 and September 29, 2010, Plaintiff requested an impartial hearing. (Riccardulli Decl., Exs. A, B; Pltf. R. 56.1 Stmt. ¶¶ 41-42) Plaintiff asserted that the school district's CSE had failed to provide C.F. with a FAPE, as the proposed placement and services did not "meet [C.F.'s] educational and other health needs." (Riccardulli Decl., Ex. B at 2) Plaintiff's letters sought "tuition to attend a 10-month program at the Aaron School . . . and any school fees and charges in connection therewith." (Id. at 3)

The impartial hearing was conducted on April 5, 2011. (Id., Ex. D (IHO Decision) at 2) Plaintiff offered testimony from herself, from Dr. Debra Schepard, the director of the Aaron School, and from Regina Barrett, C.F.'s teacher at the Aaron School. (Id. at 4) DOE called no witnesses. (Id.)

### A.   The Evidence at the Impartial Hearing

C.F. is a nine-year-old boy who was diagnosed with Pervasive Developmental Disorder Not Otherwise Specified ("PPD/NOS") when he was about 18 months old. (Tr. 35-36) PPD/NOS manifests in the form of expressive and pragmatic language delays, physical limitations, and subsequent high anxiety. (Tr. 37-38; Dubinsky Decl. ¶ 3; M.F. Decl. ¶ 5, Exs.

---

See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).

A-D (Rusk Institute Reports)).  C.F. suffers from language deficits, particularly in connection

with expressive and written language, and has trouble organizing and expressing his thoughts.

(Tr. 37, 197)  While C.F. performs at grade level, he requires "a structured and comfortable

environment" as he "often struggles with overwhelming anger and negativity."  (Dubinksky

Decl. ¶¶ 4-6)  C.F. also has deficits in motor planning, coordination, and physical strength (Tr.

38, 40-41), and he has difficulty with social interactions, such as initiating a conversation,

staying on topic, and understanding others' perspectives.  (Tr. 39)  C.F.'s eligibility for special

education and related services as a student with an "other health impairment" is not in dispute.

(Pltf. R. 56.1 Stmt ¶ 1; M.F. Decl., Exs. E, F)

> For school years 2007-08, 2008-09, and 2009-10, a CSE was convened in order to

develop an IEP for C.F.  (Id. ¶ 13)  M.F. rejected the proffered public school placement each

year, and enrolled C.F. at the Aaron School.  (Id. ¶¶ 14-15)  She also filed an impartial hearing

request each year.  (Id. ¶ 16)  DOE entered into a settlement agreement with M.F. each year, in

which it agreed to pay C.F.'s tuition at the Aaron School.[3]  (Id. ¶ 17)  C.F. also received Related

Service Authorizations ("RSAs") for therapy outside of school, at DOE's expense.  (Id. ¶¶ 18-

19)  C.F. attended the Aaron School from kindergarten through fourth grade.  (Riccardulli Decl.,

Ex. D (IHO Decision) at 3)

> The Aaron School serves children who are "average or better cognitively but

need[] a small structured multisensory approach to learning."  (Tr. 133)  The school's students

have "challenges in the areas of language, attention, sensory, and social skill needs."  (Id.)

C.F.'s fourth grade class had 12 students with "language development delays, . . . anxiety or

---

[3]  Each settlement agreement provides that the settlement cannot be considered a concession that
DOE's placement was inappropriate, or that the private school selected by Plaintiff was
appropriate.  (Def. Resp. to Pltf. R. 56.1. Stmt. ¶ 17)

other social or emotional needs, [and problems with] social skills [and] pragmatic language."

(Tr. 59, 196)  The class was taught by a teacher and teaching assistant.  (Id.)  While at the Aaron

School, C.F. received occupational therapy, adaptive physical education, speech therapy, social

skills therapy, and counseling, and participated in occupational therapy sessions referred to as the

Alert Program.[4]  (Tr. 60-65, 67-68)

### 1.    The 2010-11 School Year

On April 26, 2010, the CSE conducted a meeting at which an IEP was developed

for C.F. for the 2010-11 school year – C.F.'s fourth grade year.  (Pltf. R. 56.1. Stmt. ¶ 20)  M.F.

attended the meeting, along with C.F.'s psychologist and his teacher at the Aaron School.  (Tr.

45)  The CSE recommended the following program for C.F.:  "special class in a community

school" with a staffing ratio of 12:1 and related services, including counseling, and occupational,

physical, and speech therapy.  (M.F. Decl., Ex. E (2010-11 IEP) at 8-9; Tr. 46)  The CSE

determined that C.F. did not require a 12-month school year, but the IEP included a notation that

C.F. required counseling and occupational, physical, and speech therapy in July and August 2010

in order to prevent regression.  (Id. at 1)

On July 16, 2010, DOE notified M.F. that C.F.'s placement for his 10-month

school program would be P.S. 112 in Dutch Kills.  (Pltf. R. 56.1 Stmt. ¶ 27; M.F. Decl., Ex. F)

M.F. contacted the school, but was unable to arrange a visit until the school opened in

September.  (Tr. 51)  Although the IEP called for the above-referenced RSAs during July and

August 2010, the DOE refused to provide these services, telling M.F. that she would have to sue

---

[4]  The "Alert Program" is conducted by an occupational therapist, and teaches students "how to self regulate their bodies and their emotions" to help them "participate in either academic or social activities."  (Tr. 43)  C.F.'s teacher describes it as "basically OT [occupational therapy] in the classroom."  (Tr. 214)  The Social Skills program helps students develop social awareness and interpersonal relationships.  (Tr. 135-36)

DOE in order to obtain them.  (Tr. 46-47, 120)  C.F.'s psychologist continued to work with C.F.

during these summer months, agreeing to wait for payment.  (Tr. 47-48; M.F. Decl. ¶ 16;

Dubinsky Decl. ¶ 8)

           M.F. signed a re-enrollment contract with the Aaron School on August 16, 2010,

with the understanding that if DOE provided an appropriate placement for C.F., she would be

permitted to withdraw him from the Aaron School.  (M.F. Decl., Ex. G; Pltf. R. 56.1. Stmt. ¶ 30)

The contract provides for tuition of $45,675, with a non-refundable deposit of $5000 and the

balance "due upon payment by [the] Department of Education."  (Id.; Pltf. R. 56.1 Stmt. ¶¶ 32-

33)

           In an August 24, 2010 letter, Plaintiff informed DOE that she was rejecting the

public school placement and intended to enroll C.F. at the Aaron School.  (M.F. Decl., Ex. H)

M.F. nonetheless visited DOE's proposed placement on September 8, 2010 – the first day of

school – and met with the school's IEP facilitator and C.F.'s prospective teacher, and observed

the proposed class.  (Tr. 50-52; Pltf. R. 56.1 Stmt. ¶¶ 28-29)  This visit confirmed M.F.'s view

that the proposed public school placement was inappropriate for C.F., and C.F. remained

enrolled at the Aaron School for fourth grade.  (Tr. 52-53; Pltf. R. 56.1 Stmt. ¶¶ 30, 35)

           Because Plaintiff was unable to afford more than the $5,000 deposit, she still

owes $40,675 in tuition to the Aaron School for the 2010-11 school year.  Accordingly, Plaintiff

seeks reimbursement of her out of pocket expenses of $5,000 and a retroactive direct tuition

payment to the Aaron School of $40,675.  In addition to the services C.F. received at the Aaron

School, he received one hour of counseling per week from his psychologist, who agreed to work

without pay until the dispute between M.F. and the DOE was resolved.  (Dubinsky Decl. ¶ 8)

**B.**     **Impartial Hearing Officer's Decision**

On May 24, 2011, the IHO issued a decision in Plaintiff's favor, ordering DOE to

(1) "directly pay $40,675 to the Aaron School and pay $5000 as reimbursement to the parent for

tuition for the 2010-2011 school year"; (2) issue RSAs for speech, occupational, and physical

therapy – one hour per week – from May 24, 2011 through August 31, 2011; (3) directly pay for

counseling services provided to C.F. from July 1, 2010 to May 24, 2011; and (4) issue RSAs for

one-hour weekly counseling sessions from July 1, 2010 to June 30, 2011.  (Riccardulli Decl., Ex.

D (IHO Decision) at 13-14)

The IHO found that the Aaron School was an appropriate placement for C.F.,

noting that it "provided a program that was highly attuned to the student's needs and reasonably

calculated to enable the student to receive educational benefits":

> The student's specific needs in the classroom, academic and social-emotional, are
> addressed by, among other things, close proximity to the teacher, teacher
> facilitation of peer interactions including lunch, multi-sensory devices and
> teaching techniques, movement breaks, a structured school day, the use of a
> SMART board and graphic organizers, the use of manipulatives, extra time, visual
> tools, positive reinforcement, repetition, assistance with peers and social
> activities, and a method by which the student may communicate distress to the
> teacher privately.
>
> . . .
>
> . . .The student was in a class with students with similar deficits and of a similar
> age, his goals were appropriate for him and the strategies utilized were identical to
> and/or consistent with those specified in the IEP and were individualized for this
> student and related services were provided.

(Id. at 7-8).

The IHO noted the many therapeutic programs that C.F. received at the Aaron

School, including occupational therapy, speech therapy, adaptive physical education, social skills

training, and the Alert class.  (Id.)  The IHO also concluded that C.F. had "progressed in both

class and individual goals" as well as in "[speech], [occupational therapy], and counseling areas." (Id. at 8)  Although the Aaron School did not provide physical therapy, the IHO – citing 20 U.S.C. § 1401(9) and Frank G. – noted that a "school need not provide every recommended related service" in order for a parent to qualify for private school tuition reimbursement.  (Id. at 9)  The IHO concluded that the Aaron School was, "on balance . . . highly attuned to the student's needs and reasonably calculated to enable the student to receive educational benefits." (Id.)

The IHO also found that M.F. had "established [C.F.'s] need for afterschool services" in addition to the services offered at the Aaron School.  (Id.)  She noted that this finding does "not require a conclusion that the placement was not appropriate," as the legal standard requires only that the placement be "appropriate, and not . . . perfect."  (Id. (citing Gagliardo, 489 F.3d at 115))

The IHO further found that the CSE had recommended speech, physical, and occupational therapy, and counseling services for July and August 2010, because of concerns about possible regression; that C.F. had been entitled to, but had not received speech, physical, and occupational therapy services; and that accordingly, C.F. was entitled to "make up missed hours with one hour each week of [speech, occupational, and physical therapy] and counseling." (Id. at 10-11)  Because C.F.'s psychologist had continued to provide counseling services without payment, the IHO concluded that M.F. was entitled to direct payment to the psychologist for the counseling services that she had provided.  (Id.)

The IHO also found that the equities favored the parent.  The IHO credited M.F.'s testimony that she had considered DOE's placement, and signed the Aaron School re-enrollment contract only in order to ensure C.F. a spot, should DOE not offer an appropriate placement.  (Id.

at 11)  The IHO noted that DOE's failure "to recommend a placement until mid-July . . .

precluded a school visit prior to taking action to ensure the space."  (Id.)  The IHO concluded

that "the parent [had] cooperated with the CSE."  (Id.)

   The IHO rejected DOE's argument that any award of tuition above the $5,000

deposit would be improper, because M.F. is not liable for the balance of the tuition absent

payment by DOE.  The IHO found that (1) "[t]he parents have established their inability to pay

the tuition"; (2) there was "no persuasive evidence of bad faith or collusion"; and (3) there had

been no claim that the tuition charged by the Aaron School was unreasonable.  (Id. at 12)[5]  The

IHO also noted that C.F. would not be allowed to return to the Aaron School if the tuition went

unpaid for the 2010-11 school year.  (Id. at 12).  Under such circumstances – and given that (1)

the school district concededly had denied C.F. a FAPE; (2) the Aaron School was an appropriate

placement; and (3) the equities favored C.F.'s parents – the IHO concluded that tuition

reimbursement and a "direct retroactive payment" to the Aaron School was appropriate.  (Id. at

12-13 (citing D.A. 769 F. Supp. 2d 403 (S.D.N.Y. 2011) and S.W., 646 F. Supp. 2d 346)).

---

[5]  The IHO also addressed a loan of $20,238.50 made by the Aaron Association, Inc. to the
Aaron School in connection with C.F.'s tuition.  (Id. at 13)  The Aaron Association is a non-
profit organization that provides financial support to the Aaron School.  It is funded by parent
donations. (Tr. 139-41)  Where a parent without adequate financial resources has made a $5,000
deposit to reserve a place at the Aaron School, and is seeking tuition reimbursement or a direct
tuition payment from DOE, the Aaron Association will make a loan to the Aaron School to cover
operating expenses associated with that child until payment has been obtained from DOE.  (Tr.
141)  If a tuition payment from DOE is obtained, the Aaron School repays the Aaron Association
for the loan.  If a tuition payment or reimbursement is denied, the Aaron School has no
obligation to repay the loan.  (Id.)

The IHO found that the transaction between the Aaron Association and the Aaron School is
irrelevant, because C.F.'s parents were never aware of the loan or its terms.  The IHO concluded
that the loan provides no "basis for reducing the amount the parent is entitled to have paid to [the
Aaron School]."  (Riccardulli Decl., Ex. D (IHO Decision) at 13)

C.      <u>**State Review Officer's Decision**</u>

DOE appealed the IHO's decision.  On August 25, 2011, an SRO affirmed the IHO's decision to award compensatory RSAs for therapy and counseling that C.F. was entitled to receive during the summer of 2010, but annulled the rest of the IHO's decision, including as to tuition reimbursement for the 2010-11 school year.  (Riccardulli Decl., Ex E (SRO Decision) at 9-11)  Because the SRO found that the Aaron School was not an appropriate placement, she did not reach the question of whether the equities favored tuition reimbursement.  (<u>Id.</u> at 11)

The SRO found that the Aaron School was not an appropriate placement because "the student required the provision of 12-month services in order to prevent substantial regression," and the Aaron School "did not provide the student with any services during July and August 2010" as called for in the IEP.  (<u>Id.</u> at 8)

The SRO also noted that "the April 2010 IEP recommended individual speech-language therapy, individual [occupational therapy], counseling in a small group, and individual [physical therapy]; all of which the Aaron School did not provide during the 2010-11 school year."  (<u>Id.</u> at 8 (internal citations omitted))  While acknowledging that C.F. received speech language therapy in a group of two, occupational therapy in a group of 2, and individual counseling services at the Aaron School, in addition to "adapted physical education and the 'Alert' and 'Social Skills' programs" which met weekly, the SRO found that "the amount and frequency of those related services were insufficient to meet the student's needs in this case." (<u>Id.</u> at 8-9)

The SRO sustained that part of the IHO's decision that awarded compensatory RSAs for speech, occupational, and physical therapy, and counseling, not provided to C.F. in July and August 2010.  Because the "district should have begun implementing the student's

April 2010 IEP" but failed to provide services during July and August 2010, the SRO found that

the "deprivation of instruction [could] be remedied through the provision of" make-up services.

(Id. at 10)

## III.   DISCUSSION

### A.   Standard of Review

Federal courts reviewing administrative determinations under the IDEA "must

base their decisions on 'the preponderance of the evidence,' taking into account not only the

record from the administrative proceedings, but also any further evidence presented before the

District Court by the parties."[6] Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir.

2003); see 20 U.S.C. § 1415(i)(2)(C); Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366,

377 (S.D.N.Y. 2006).  At summary judgment, "[t]he inquiry . . . is not directed to discerning

whether there are disputed issues of fact, but rather, whether the administrative record, together

with any additional evidence, establishes that there has been compliance with IDEA's processes

and that the child's educational needs have been appropriately addressed."  Jennifer D. ex rel.

Travis D. v. N.Y.C. Dept. of Educ., 550 F. Supp. 2d 420, 429 n.10 (S.D.N.Y. 2008) (quoting

Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996)).  This review

of the record is "by no means an invitation to the courts to substitute their own notions of sound

educational policy for those of the school authorities which they review."  Rowley, 458 U.S. at

206; Walczak, 142 F.3d at 129.

"Deference is particularly appropriate when . . . the state hearing officers' review

has been thorough and careful."  Walczak, 142 F.3d at 129.  While a reviewing court must give

---

[6]  Plaintiff has submitted declarations from herself and from Lisa Dubinsky, C.F.'s psychologist.
These declarations do not add appreciably to the information found in the administrative record,
however.

the administrative decisions "due weight," it need not defer to reasoning unsupported by the

record.  R.K. v. N.Y.C. Dept. of Educ., No. 09 Civ. 4478 (KAM), 2011 WL 1131492, at *26

(E.D.N.Y. Jan. 21, 2011) (citing A.D. v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 690 F.

Supp. 2d 193, 207 (S.D.N.Y. 2010) (overturning SRO's decision, despite the obligation to give

administrative officer's decision "due weight," because SRO did not properly analyze the

evidence in the record)).  Where the findings of the IHO and SRO conflict, the findings of the

IHO may be afforded "diminished weight."  See Gagliardo, 489 F.3d at 113 n. 2 (citing Karl v.

Bd. of Educ., 736 F.2d 873, 877 (2d Cir. 1984) (courts owe deference to the final agency

determination where the review officer disagrees with the hearing officer)).

      **B.**     **Plaintiff's Burden to Prove that a Unilateral Placement is Appropriate**

           **1.**     **Applicable Law**

Where, as here, a school district has failed to provide a student with a FAPE, the

first prong of the Burlington/Carter test is satisfied.  A parent seeking tuition reimbursement or a

retroactive direct tuition payment must then go on to demonstrate, however, that his or her

unilateral private placement was appropriate.  Gagliardo, 489 F.3d at 112 (citing M.S. ex rel. S.S.

v. Bd. of Educ., 231 F.3d 96, 104 (2d Cir. 2000)).  While evidence of a student's success at the

unilateral placement is relevant to the court's review, such evidence is not sufficient in itself to

establish that the placement was appropriate.  Gagliardo, 489 F.3d at 115 (citing Berger v.

Medina City Sch. Dist., 348 F.3d 513, 522 (6th Cir.2003) ("[E]vidence of academic progress at a

private school does not itself establish that the private placement offers adequate and appropriate

education under the IDEA."); Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 26-27 (1st

Cir. 2002) (same)).

Instead, the question turns on "whether a placement – public or private – is 'reasonably calculated to enable the child to receive educational benefits.'"  Frank G., 459 F.3d at 364 (quoting Rowley, 458 U.S. at 207).  As the Second Circuit has noted,

> [n]o one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits.  Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs.

Id. at 364-65 (internal citations omitted).

"In essence, 'the test for the parents' private placement is that it is appropriate, and not that it is perfect.'"  R.E. v. New York City Dept. of Educ., 785 F. Supp. 2d 28, 44 (S.D.N.Y. 2011) (quoting Frank G., 459 F.3d at 364); see also M.S. v. Board of Educ. of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000) (citing Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999)).  "[P]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential."  Frank G., 459 F.3d at 365.  Indeed, "the standard applied to determine the appropriateness of parental placements is less restrictive and subject to fewer constraints than that applied to the school authorities," C.B. v. N.Y.C. Dept. of Educ., No. 02 Civ. 4620 (CLP), 2005 WL 1388964, at *16 (E.D.N.Y. Jun. 10, 2005), and tuition reimbursement has been found appropriate even where the private school "fail[ed] to meet state education standards."  Carter, 510 U.S. at 14.  In sum, a private placement that meets the standard of "reasonably calculated to enable the child to receive educational benefits'" "is one that is 'likely to produce progress, not regression.'"  Gagliardo, 489 F.3d at 112 (quoting Walczak, 142 F.3d at 130)).

2.     **The Aaron School was an Appropriate Placement**

As discussed below, the evidence shows that the Aaron School was an appropriate

placement for C.F. because it was ""'"reasonably calculated to enable [him] to receive

educational benefits."'"  <u>Frank G.</u>, 459 F.3d at 364 (quoting <u>Walczak</u>, 142 F.3d at 122 (quoting

<u>Rowley</u>, 458 U.S. at 207))).

In mechanically comparing the IEP's requirements to what the Aaron School

provided, the SRO ignored the Second Circuit's instruction that a private placement need not

offer every service listed in an IEP:

> To qualify for reimbursement under the IDEA, parents need not show that a
> private placement furnishes every special service necessary to maximize their
> child's potential.  They need only demonstrate that the placement provides
> educational instruction specially designed to meet the unique needs of a
> handicapped child, supported by such services as are necessary to permit the child
> to benefit from the instruction.

<u>Frank G.</u>, 459 F.3d at 365 (citation and internal quotation marks omitted).  Moreover, in finding

that the Aaron School was not an appropriate placement because it did not offer a 12-month

program, and had not provided therapy and counseling services to C.F. in July and August 2010,

the SRO ignored the fact that (1) the IEP did not require a 12-month program; and (2) it was

DOE, and not the Aaron School, that was responsible for providing therapy and counseling

services to C.F. in July and August 2010.

a.     **The Aaron School Offered a Program Tailored to C.F.'s Needs**

C.F. requires various related services, including speech therapy and occupational

therapy, in order to benefit from academic instruction.  The record is clear that the Aaron School

offered him these services.  C.F.'s 2010-11 IEP called for the following:

> **Counseling:**  one 30 minute session per week in a group of 2
> **Occupational Therapy (OT):**  one 30 minute session per week in a group of 2
> **Occupational Therapy (OT):**  one individual 30 minute session per week

**Physical Therapy (PT):**  one individual 30 minute session per week
**Speech Therapy (ST):**  one individual 30 minute session per week
**Speech Therapy (ST):**  one 30 minute session per week in a group of 2
**Adaptive physical education:**  in a group of 12:1

(M.F. Decl., Ex. E (2010-11 IEP) at 5, 9)

At the Aaron School, C.F. received 30 minutes of counseling, speech therapy, and occupational therapy each week.  His counseling sessions were individual, while the occupational and speech therapy sessions were in groups of two.  In addition, C.F. received three 30-minute sessions each week of adaptive physical education.  (Tr. 212, 216-18)  C.F. also participated in the Alert Program and the Social Skills program for 30 minutes each every week.  (Tr. 213-15)  While the Aaron School did not provide C.F. with all of the sessions listed in the IEP, there is significant overlap between the services listed in the IEP and the services that C.F. received.  Moreover, the Aaron School offered additional services – such as the Alert Program and the Social Skills program – that do not correlate entirely with the sessions listed in the IEP but which clearly target the same needs.  For example, C.F.'s teacher testified that the Alert Program is taught by an occupational therapist and "is basically OT in the classroom."  (Tr. 214)

The record also shows that the Aaron School's curriculum and program is designed for students with needs like those of C.F.  The Aaron School offers a comprehensive therapeutic program in a highly structured school environment, with occupational therapy, speech therapy, counseling, adaptive physical education, and social skills training all intertwined with academics.  (Tr. 135)  Each student at the Aaron School has a "team" that meets weekly to discuss the student's progress, including the classroom teacher, teacher assistant, psychologist, occupational therapist, and speech therapist.  (Tr.  135, 208)

Teachers at the Aaron School all have master's degrees in special education, understand the needs of each child, and work in a setting small enough to adapt to the needs of

16

each student.  (Dubinsky Decl. ¶ 19; Tr. 134)  The school has occupational therapists, speech and language pathologists, social workers and psychologists on staff.  (Tr. 135)

        C.F. was in a class of 12 students, with similar deficits, taught by a head teacher and assistant teacher.  (Tr. 196)  The structure for C.F.'s instruction at the Aaron School was thus superior to the 12:1 ratio specified in the IEP.  (Tr. 196; M.F. Decl., Ex. E (2010-11 IEP) at 1) The record indicates that this setting also provided for C.F.'s social and emotional needs as specified in the IEP.

        The 2010-11 IEP calls for "[a]ccess to sensory tools, [b]ody breaks as needed, [v]isual reminders at his desk of coping strategies to utilize when confronted with frustration, [t]eacher facilitation to help him join group games/social activities for initiating and maintaining peer interactions and social problem solving with peers, [m]odifications to his chair may be warranted, [w]hen overstimulated, he may need a break from the classroom environment."  (M.F. Decl., Ex. E (2010-11 IEP) at 4)  At the Aaron School, C.F. was placed in the front of the classroom to make him more comfortable speaking; he used sensory tools; and the class took frequent movement breaks.  (Tr.199-200; M.F. Decl., Ex. E (2010-11 IEP) at 4)  C.F. also used objects called "fidgets" to help him pay attention in class and stimulate his learning.  (Tr. 211) Because C.F. struggles with anxiety in unstructured social situations, his teacher helped him create a personal lunch schedule.  (Tr. 227)  The class also took routine "body breaks" to break-up the sitting time.  (Tr. 215; M.F. Decl., Ex. E (2010-11 IEP) at 4)  In sum, the record indicates that the Aaron School was "highly attuned to [C.F.]'s therapeutic needs, including the ways in which [C.F.'s] difficulties regulating [his] senses and behavior inhibited [his] ability to participate in traditional forms of classroom learning."  A.D., 690 F. Supp. 2d at 211.

**b.      C.F.'s Progress at the Aaron School**

C.F.'s progress during the 2010-11 school year – in areas cited in his IEP – suggests that the Aaron School was an appropriate placement.  The evidence offered at the hearing demonstrates that C.F. has done well in writing, social studies, and science.  (Tr. 203-05; see M.F. Decl., Ex. E (2010-11 IEP) at 6.1)  He has made strides in his expressive and advocacy skills.  (Tr. 229)  His motor skills have likewise improved, with his handwriting seeing significant improvement.  (Tr. 210, 212; see M.F. Decl., Ex. E (2010-11 IEP) at 6.5)  C.F.'s speech has also improved.  His teacher testified that C.F. has become more aware of his tone of voice, and can "shift his tone of voice from maybe negative or angry or mad to more pleasant and friendly, which is something that he really had a hard time with in the beginning of the year."  (Tr. 209-10)  C.F. is also no longer "impacted by his physical endurance or stamina . . . in the classroom when he is sitting down or doing written work."  (Tr. 241-42)  With respect to social interactions, C.F. can now "engage in conversations more appropriately with a peer on a consistent basis," without teacher intervention.  (Tr. 201; see M.F. Decl., Ex. E (2010-11 IEP) at 6.4)  In short, it is both apparent and undisputed that C.F. made significant progress at the Aaron School during the 2010-11 school year in line with his IEP goals.

**c.      The SRO's Rejection of the Aaron School**

In concluding that the Aaron School was not an appropriate placement for the 2010-11 school year, the SRO cited its failure to offer all of the services listed in the IEP; the fact that it did not offer a 12-month program; and its failure to provide C.F. with speech, occupational, and physical therapy, and counseling, in July and August 2010.  (Riccardulli Decl., Ex. E (SRO Decision) at 7-9)  While recognizing the deference owed to the SRO's decision, this Court finds that the SRO applied a more rigorous standard than that required by the case law,

mischaracterized what the IEP required, and held the Aaron School responsible for a failure to offer summer services that it was not obligated to provide.

As noted above, the law is clear that a parent's unilateral placement need not provide every service listed in an IEP: "the parents' unilateral placement need not be perfect, [and] need not meet all of the child's special education needs . . . to satisfy the Prong II standard." R.E., 785 F. Supp. 2d at 44 (citing Frank G., 459 F.3d at 364). C.F. received most of the services specified in his IEP, albeit not always in the form or duration specified in the IEP. In addition, he received other services at the Aaron School, such as the Alert Program and Social Skills program, that addressed his deficits. He was in a class with a better than 12:1 ratio, with students suffering from similar impairments, and with faculty who understood and addressed his specific needs. The fact that the services C.F. received were not in the precise form listed in the IEP is not dispositive, given the evidence that the Aaron School offered a program that addressed C.F.'s needs. Likewise, the fact that M.F. requested additional RSAs does not take away from C.F.'s capacity to benefit from the instruction provided by the Aaron School. See Frank G., 459 F.3d at 365 ("[P]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential.").

Furthermore, in rejecting the Aaron School because it offered a 10-month and not a 12-month program (see Riccardulli Decl., Ex. E (SRO Decision) at 8), the SRO ignored the fact that the IEP does not require a 12-month school year for C.F. (M.F. Decl., Ex. E (2010-11 IEP) at 1) Although the IEP calls for RSAs to be provided for therapy and counseling in July and August 2010 to prevent regression, the record establishes, and both the IHO and SRO decisions confirm, that it is DOE – and not the Aaron School – that is at fault for not providing these services to C.F. (See Riccardulli Decl., Ex. E (SRO Decision) at 10 ("[D]uring the time

period commencing July 1, 2010, when the district should have begun implementing the student's April 2010 IEP, and ending when the parent rejected the recommended placement by letters . . . the student did not receive the services mandated in his IEP. . . ."); Riccardulli Decl., Ex. D (IHO Decision) at 10.)  Given that the 2010-11 school year ran from July 1, 2010 to June 30, 2011, July and August 2010 are part of the 2010-11 IEP.  It was DOE's obligation to make the necessary services available to C.F. in July and August 2010 (see id.; Tr. 46-47), and its failure to do so does not make the Aaron School an inappropriate placement.[7]

In sum, Plaintiff has demonstrated that the Aaron School was "specially designed to meet [C.F.'s] needs because it provided a sufficiently structured environment with specific services mandated in his IEP to address [his] learning disabilities and behavioral problems." Jennifer D., 550 F. Supp. 2d at 435.  In reaching this conclusion, the Court is mindful of its responsibility to "give due weight to the administrative proceedings," and, in particular, to give deference to the conclusions of the SRO.  A.D., 690 F. Supp. 2d at 207.  Here, however, the SRO did not properly apply the applicable legal standard, and used DOE's failure to meet its responsibilities as a basis for rejecting the private placement selected by the parent.

### D.   The Equities Favor the Parent

Where a parent has satisfied the first two prongs of the Burlington/Carter test, a determination of appropriate relief is made based upon various equitable considerations.  See Still v. DeBuono, 101 F.3d 888, 892 (2d Cir. 1996); cf. M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 (2d Cir. 2000) ("It is well established that 'equitable considerations are

---

[7]  The SRO upheld that part of the IHO's decision awarding compensatory RSAs for July and August 2010, confirming that DOE was obligated to provide C.F. with services during those months.  (Id.)  Given that it was DOE's responsibility to provide these services to C.F. in July and August 2010, it makes no sense to find the Aaron School an inappropriate placement because it offered a 10-month program.

relevant in fashioning relief' under the IDEA." (quoting <u>Burlington</u>, 471 U.S. at 374)). Given that the goal of IDEA is "to give handicapped children both an appropriate education and a free one[,] it should not be interpreted to defeat one or the other of those objectives." <u>Burlington</u>, 471 U.S. at 372.

In determining whether tuition reimbursement or a retroactive direct tuition payment is appropriate, a court should consider, <u>inter alia</u>, whether a parent cooperated with the school district, including by giving notice of dissatisfaction with an IEP. <u>See</u> <u>M.C.</u>, 226 F.3d at 68 ("[R]eimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP."). Reimbursement may also be reduced or denied where parents fail to disclose their "concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412 (a)(10)(C)(iii)(I)(aa); <u>see</u> <u>id</u> § 1412 (a)(10)(C)(iii)(III) (tuition reimbursement awards may be reduced or denied "upon a judicial finding of unreasonableness with respect to any actions taken by the parents").

Here, the record demonstrates that M.F. fully cooperated with the DOE, communicated her concerns about C.F.'s IEP, and acted reasonably at all times. M.F. attended the meeting of the CSE for the 2010-11 IEP, and asked a number of questions about the IEP. (Tr. 49-50) Once she received the public school placement in mid-July 2010, M.F. contacted the school, hoping to arrange a visit. The school was not open until September, however. Accordingly, M.F. visited on the first day of school, met with the school's IEP facilitator and C.F.'s prospective teacher, and observed C.F.'s proposed class. (Tr. 50-54) There is no dispute that M.F. promptly notified the District that she was rejecting the placement. (M.F. Decl., Ex. H)

The fact that M.F. signed a re-enrollment contract with the Aaron School before visiting the proposed public school placement does not weigh against reimbursement or retroactive direct tuition payment.  This action was necessary to ensure that C.F. would have a spot at the Aaron School should DOE's placement prove inappropriate.  (Tr. 55)  Moreover, M.F.'s re-enrollment contract with the Aaron School permitted her to withdraw C.F. from the Aaron School if DOE offered a FAPE.[8]  (M.F. Decl., Ex. G)  See Jennifer D., 550 F. Supp. 2d at 437 (the fact that parent had entered into a contract on the day that she received the placement did not weigh against reimbursement where parent was otherwise cooperative and visited the public school placement).  Given that the public school placements had proven inappropriate for each of the previous three years, it was prudent for M.F. to ensure that C.F. would have a spot at Aaron School for the 2010-11 school year.  (Tr. 55)

This case is thus entirely dissimilar to those in which courts have denied tuition reimbursement based on equitable considerations.  See Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P., 373 F. Supp. 2d 402, 404-05, 417-18 (S.D.N.Y. 2005) (parents did not seek a CSE evaluation until just before the start of the school year, and then enrolled child in a private school without giving the school district a realistic chance to evaluate the child and formulate an IEP); M.C., 226 F.3d at 68-69 (parents "failed to raise any issue" regarding the extent or nature of a particular service provided for the student in the IEP until "at least eight months after [the] treatment . . . had ended") (emphasis omitted); S.W., 646 F. Supp. 2d at 364 (denying retroactive

---

[8]  The re-enrollment contract states:  "I have advised Aaron School that after the signing of this Enrollment contract, I expect to continue to work with the Committee on Special Education to identify an alternative placement for my child in the public school or in a nonpublic school that has a contract with New York City Department of Education ("DOE").  I have further advised Aaron School that if the Department of Education offers my child an appropriate and free education, I may accept that offer and withdraw my child from the Aaron School."  (M.F. Decl., Ex. G at 2)

direct tuition payment where plaintiff did not give written notice to DOE that she was rejecting the public school placement and enrolling the student in a private school until four months after the student began attending the private school, seven months after the CSE meeting, and three months after visiting the public school placement).

There is no evidence here that Plaintiff "acted with the requisite level of unreasonableness or misconduct such that reimbursement should be denied on equitable grounds." Jennifer D., 550 F. Supp. 2d at 437; see also R.K., 2011 WL 1131492 at *30 ("Absent further evidence that the Parents never intended to seek a public school placement, the Court declines to infer bad faith on the part of the Parents, who sought to educate themselves about various school options and to make arrangements to preserve their options should the DOE's recommended placement prove to be inadequate."). The IHO, who heard and assessed the credibility of the witnesses, found that Plaintiff acted in good faith at all times. (Riccardulli Decl., Ex. D (IHO Decision) at 11-12) The IHO's "findings remain highly relevant with respect to matters not considered by the SRO on appeal." A.D, 690 F. Supp. 2d at 211 (citing Gagliardo, 489 F.3d at 113-14 (counseling deference to the IHO with respect to issues on which the SRO did not make explicit factual findings)). This Court agrees with the IHO as to the reasonableness of Plaintiff's actions, and finds that the equities favor Plaintiff.

Finally, this Court finds no reason to reduce tuition reimbursement or the retroactive direct tuition payment based on the loan made by the Aaron Association to the Aaron School. M.F. had no knowledge of the loan, which was an internal transaction between the Aaron School and the non-profit parents organization that supports it. For the reasons stated by the IHO, this transaction is simply irrelevant to whether M.F. is entitled to a tuition remedy under IDEA. As this Court stated in D.A., 769 F. Supp. 2d at 426-27, parents should not be

denied a tuition remedy merely because of their lack of financial resources to "front" the cost of tuition.[9]

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted. The Clerk of the Court is directed to terminate the motion, enter judgment for Plaintiff, and to close this case.

Dated: New York, New York
June 4, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[9] Defendants have not argued that M.F. lacks standing to pursue this action or the remedies she seeks. Any such argument would fail. Because Defendants concededly denied a FAPE to C.F., M.F. has standing to bring this action and to pursue the remedies sought in the Complaint. See, e.g., S.W., 646 F. Supp. 2d at 359.